IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  06-cv-02003-WYD-KLM

PAMELA J. STONEY,

      Plaintiff,

v.

CINGULAR WIRELESS L.L.C., a Delaware corporation,

      Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment (filed December 4, 2007).  The claims in this case relate to Plaintiff's termination of employment in July 2004.  Plaintiff asserts two claims that she was wrongfully terminated in violation of public policy.

The first claim asserts that Defendant wrongfully terminated Plaintiff's employment "because she had exercised her right to attempt to be paid the correct amounts for her and for members of her team for the commissions that they had earned." (Comp. ¶ 13).  Her second claim asserts that Defendant wrongfully terminated her employment "because she had exercised her right as an employee and as a citizen to have the Colorado Department of Labor investigate her allegations of improper pay and improper pay practices."  (*Id.*, ¶ 17.)

Defendant asserts in its Motion for Summary Judgment that Plaintiff's admissions during discovery conclusively establish that Defendant was fully justified in terminating her employment based on Plaintiff's blatantly insubordinate behavior towards her supervisor. Defendant further asserts that in her deposition testimony Plaintiff admitted that virtually every allegation she has made to support her wrongful termination claim is not true. Accordingly, Defendant contends that summary judgment is appropriate. Plaintiff denies these allegations and asserts that there are genuine issues of material fact that defeat summary judgment.

II.    FACTUAL BACKGROUND

I first note that voluminous facts have been asserted by both parties in connection with the summary judgment motion and briefing. I have stated herein only those facts which I deem most pertinent to my ruling. I have, however, construed all of the facts in the light most favorable to Plaintiff as I must for purposes of this summary judgment motion. *See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008).

I also note that by Order dated April 18, 2008, I deferred a ruling on Defendant's Motion to Strike to the extent that it sought to strike the affidavit submitted in support of Plaintiff's Response Brief. I indicated that portion of the motion would be considered in connection with the merits of the summary judgment motion. I now deny that motion. There is authority for the proposition that an affidavit which conflicts with the affiant's prior sworn statements will be disregarded if it constitutes an attempt to create a sham fact issue. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). I reject the

argument that Plaintiff's affidavit attempts to create a sham fact issue, and thus deny the motion to strike the entire affidavit. However, to the extent that Plaintiff's affidavit does contradict her deposition testimony, I have relied on specific deposition testimony where appropriate as compared to the more conclusory testimony in the affidavit.

I now turn to the material facts. Plaintiff was hired by AT&T Wireless Services, Inc. (subsequently Cingular Wireless L.L.C., referred to as "Defendant" or "the company") on January 5, 1998 as an Enterprise Sales Manager in the Global Markets Group. Plaintiff supervised a team of sales representatives, referred to as Enterprise Corporate Account Managers ("ECAMS"). Plaintiff was under Ms. Caprio's supervision from January 1, 2004 until the termination of her employment on July 12, 2004.

While she was on leave in early 2004, the acting sales manager for Plaintiff's team sent Ms. Caprio an e-mail stating that he had learned from members of the team that Plaintiff was not requiring them to follow several of the procedures that sales managers were required to follow. Plaintiff admits this but asserts that several of his criticisms were not accurate.

In order to take pressure off of Plaintiff when she returned to work from her leave in May, Ms. Caprio held back some of the quota for which Plaintiff's team was responsible. Plaintiff's team was thus not required to meet the full quota requirements for May. At the end of May, Ms. Caprio was informed that she could no longer hold back any of her team's quota, and that she was required to assign the full quota requirement in June. Defendant attaches an e-mail from Ms. Caprio of June 2, 2004, to the sales managers informing them about the quotas that were due for that month.

Defendant contend that this e-mail required the sales managers to distribute these quotas to their teams.  Plaintiff denies this.  She asserts that she had raised issues with Ms. Caprio about the accuracy of the quota information she was provided in early June 2004 and was told those numbers would be corrected.  Specifically, she asserts that on June 7, 2004, she asked Ms. Caprio in an e-mail whether the quotas would be corrected to account for the fact that one of her team members had resigned.  On June 8, 2008, she was allegedly informed by management that "June through December will be redone for everyone."  On June 10, 2004, Ms. Caprio sent an e-mail to Plaintiff and her peers asking them to check the May quota.  On June 16, 2004, Ms. Caprio sent an e-mail to Plaintiff and other sales representatives giving them their numbers for June to December quota and stating, "Do NOT pay attention to may.  I do not have the final spreadsheet with lock down but at lease [sic] you can get started with how much you want to assign to ecam by month. The format will be the same we just have to wait for it to be locked."  Plaintiff contends that she understood from the foregoing that there were errors with the June numbers.[1]

Thus, instead of apprising her team of the full amount of the June quota targets, Plaintiff distributed the reduced quota she had in May.  Plaintiff did not notify her team of the actual full amount of the June quota until sometime in the week of June 14, 2004 (according to Plaintiff) or June 22, 2004 (according to Defendant).  While Plaintiff disputes the date she notified her team of the June quota, it appears from the actual

---

[1] Plaintiff informed Ms. Caprio on Monday, June 21, 2004 that she felt the quota assignments still did not appear to be accurate.   Further, Plaintiff informed Nancy Mayer that she was concerned she might lose more people if the quota numbers were raised to an unrealistic level.

evidence that Plaintiff did not notify her team of the correct quota until June 22, 2004. (Ex. 11 to Pl.'s Amended Br. in Opp. to Def.'s Mot. for Summary J., Cingular-Stoney000861-862, e-mail from Plaintiff to Ms. Caprio of June 22, 2004) ("With only 8 days remaining in the month, 6 of them business days, I assume I am to advise my ECAMs that, essentially, their quota for this month and the remaining months is dramatically, suddenly, increased, in fact nearly doubled").  Plaintiff admitted in her deposition testimony that this e-mail indicated that on June 22, 2004, she was distributing the additional quota that Ms. Caprio had e-mailed her on June 2, 2004. Certainly it is undisputed from that evidence that Ms. Caprio believed as of June 22, 2004, that Plaintiff had not distributed the full quota to her ECAMS.

Witnesses that work in the sales organization acknowledged that it would be a serious concern, and would create substantial morale problems, for a sales manager to notify a team on the 22nd of the month that the actual quota that they were required to meet in order to earn their target commission for the month was higher than the quota amount that had been assigned on the first of the month.  When Ms. Caprio learned on June 22, 2004 that Plaintiff had not distributed the full June quota, she contacted Gail Scott in Human Resources to obtain advice concerning how to handle the situation.  Ms. Scott worked with Ms. Caprio to place Plaintiff on a Performance Improvement Plan ("PIP") to address the issue.

On June 11, 2004, the company e-mailed the sales managers directing them to perform a reconciliation project to identify mistakes in the company's system that was used to track sales in order to calculate commissions owed to sales representatives.

Plaintiff asserts that she did not receive this e-mail message. She admitted, however, in her testimony that the company was performing the reconciliation project in late June. The sales managers were required to reconcile all sales for the representatives on their teams, and, according to Defendant, to file appeals where errors were identified so that the errors could be corrected and the sales representatives paid correctly.[2] The deadline for completion of the project was July 8, 2004.

Plaintiff took a vacation during the last week of June. By the end of June, with the exception of Plaintiff, Ms. Caprio had received input from the other sales managers indicating that they were working on, or had completed, the reconciliation project. She had not received any appeal or other input from Plaintiff indicating that she had started on the project. Ms. Caprio trained Plaintiff's peers on how to do the reconciliation project during Plaintiff's absence. Plaintiff believes that training was scheduled after she received approval for her vacation. On Thursday, July 1, 2004, Ms. Caprio sent information to Plaintiff and two of her peers asking "who ever is doing [Plaintiff's] training to remember certain steps that Plaintiff needed to take." On July 2, 2004, Plaintiff asked Mr. Wilden to train her, which he did that day. She thus contends that Ms. Caprio knew that she could not have started the project by the end of June.

Nonetheless, with Plaintiff on vacation and the approaching Fourth of July weekend, Ms. Caprio believed that there was a substantial risk that the deadline would be missed for Plaintiff's team. While Plaintiff disputes that Ms. Caprio's belief was appropriate, it appears that Ms. Caprio probably did at least some portion of the project.

---

[2] Plaintiff disputes that any evidence was tendered on the requirement to file appeals.

One of the steps necessary to complete the reconciliation project was to confirm that the account assignments (i.e., matching each sales representative with the correct customer accounts) in the company's computer system were up to date and accurate. This information could only be obtained from Plaintiff.  On July 6, 2004, Plaintiff telephoned Ms. Caprio because the formula that Plaintiff had was not working.  She admits that part of that conversation related to the reconciliation project.[3]

Plaintiff asserts that in this or another telephone call with Ms. Caprio in early July, Ms. Caprio screamed at her for two to three hours and accused her of not requesting information earlier.  Defendant admits that the conversation was an extended one, lasting over two hours, and that Ms. Caprio criticized Plaintiff for not starting the reconciliation project earlier.  Defendant asserts that the conversation was so long because Ms. Caprio was going over information that she had to obtain from Plaintiff to finish the project.

On July 7, 2004, Ms. Caprio sent an e-mail to Plaintiff transmitting the PIP and informing Plaintiff that they would discuss it at a one-on-one meeting scheduled July 9, 2004.  As to PIPs generally, Nancy Mayer, who was employed as an HR generalist by Defendant in June and July 2004, testified in her deposition that the company followed a three-step process for the issuance of a PIP.  According to that process, where a sales representative failed to meet his or her quota or for other employee performance issues there were three steps – a verbal warning, a written warning and then a final written

---

[3]  Ms. Caprio had family members that were seriously ill in July, 2004, but Plaintiff denies knowing this.

warning that warned the sales representative that the next step could be termination of employment. Plaintiff contends that she was not provided a verbal or a written warning before she was given the PIP. She also contends that she was not provided coaching or counseling before the PIP was issued, as set forth in various documents of the Defendants. Further, she was not disciplined in any manner before she was informed that she would be placed on a PIP.

Ms. Mayer also testified, however, that the company's Colleague Guide was the controlling document in terms of PIPs. That guide says that the company reserves the right at its sole discretion to impose any form of corrective action that it believes appropriate. Further, the Colleague Guide also says, "There are some non-performance related situations for which, in the opinion of the Company, immediate dismissal generally is appropriate." Similarly, the Manager's Guide provided that:

> Managers are not required to initiate corrective action before terminating an employee. Employment at the company remains at-will and nothing in these performance management guidelines alters this employment relationship. In all situations, the Company reserves the right and retains the sole discretion to impose any form of discipline it believes appropriate, or to terminate the employment relationship immediately, with or without reason or advance notice. It is important that mangers use their own discretion and judgment in matters concerning management of employee performance.

Ms. Nienhaus, who testified on behalf of Defendant in a Rule 30(b)(6) deposition, testified about the company's document entitled "Manager's Guide to Successful Performance". That document stated that a PIP should include accurate documentation of any past coaching efforts. When asked whether that would apply to first-level managers, she stated that it was situational in nature and that the guidelines as to PIPs were not applicable in all situations. Instead, there could be a situation that falls within

the company's right to terminate immediately, without putting an employee on a PIP, which could include insubordination. Finally, she testified that it was not a mandatory policy for a frontline manager to be verbally coached before putting him or her on a PIP—it depended on the situation.

In response to the e-mail from Ms. Caprio transmitting the PIP, Plaintiff admits that on July 7, 2004 she sent the e-mail to Ms. Caprio attached as Exhibit 14 to Defendant's Brief in Support of its Motion for Summary Judgment. That e-mail stated:

> I am not surprised by your complaints as listed in the attachment, HOWEVER, I take exception.
>
> That you **held me hostage on the phone for 3 hours** last evening and, again, 45 minutes this morning, were clear indicators of harassment and abuse, as well as 'TRUMPED' charges of performance issues. HENCE, the copy to HR and my peers.
>
> I have assembled all of the "QUOTA" e-mails, should we discuss those, in addition to the latest "operations" project that sublimates myself and my peers to completion of Finance and Operations projects to get PAID, via "DISPUTE" PROCESS.
>
> I find it intriguing that you would intimate I have affected my TEAM as a negative "morale factor". I am truly interested  their feedback. [sic]
>
> I am willing to conduct a call with you if HR is in attendance.
>
> I, BTW, have completed all of your required submissions for MISSING MINS, timely, to Stephanie Thomas.
>
> PJ

*Id.*

Plaintiff distributed this e-mail to all of the sales managers that reported to Ms. Caprio as well as Plaintiff's own direct reports (who were also part of Ms. Caprio's organizational channel). Plaintiff admits that, in the course of her entire professional

career, she has never heard of an individual who was put on a PIP responding by distributing the performance plan to their peers and subordinates.

Plaintiff admits that, with respect to the four or five PIPs that she prepared for her subordinates that were not meeting expectations, she would have been concerned had one of them responded by sending the PIP to their peers and any of their own subordinates. Plaintiff also admits that it was poor judgment to send the e-mail to Ms. Caprio and that, in hindsight, she would have changed some of the language. Further, she admits that "under some circumstances" her email to Ms. Caprio could be characterized as an insubordinate response to a supervisor. On July 7, 2004, Plaintiff believed she was going to be fired which was why she "shared" the email with her peers and subordinates.

On the morning of July 8, 2004, Ms. Caprio contacted Gail Scott to obtain Ms. Scott's advice concerning the July 7, 2004 e-mail from Plaintiff. Ms. Caprio also notified her supervisor, Regional Vice President Kathy Ray, about the e-mail.

On July 9, 2004, Plaintiff was interviewed by Gail Scott regarding her July 7, 2004 e-mail to Ms. Caprio. Plaintiff admits that Ms. Scott gave her a fair opportunity to tell her side of why she sent the e-mail to Ms. Caprio and to explain her complaint against Ms. Caprio. Also on July 9, 2004, Ms. Scott told Plaintiff that she was being placed on leave pending a further decision by the company regarding her employment, that she should turn in her laptop, her blackberry and any other company equipment in her possession and that she would be notified the next week what action the company would take on the basis of her July 7, 2004 e-mail.

On July 9, 2004, Plaintiff filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") alleging that she had been suspended on the basis of her sex, age and in retaliation for a sexual harassment complaint that she filed in 2003. In the CCRD's Probable Cause Determination, the CCRD rejected Plaintiff's claims concluding, "The record shows that the Charging Party had documented performance deficiencies resulting in the Respondent placing her on a Performance Improvement Plan. . . . However, the evidence does indicate that had the Charging Party responded to her PIP with professional etiquette and taken responsibility for her shortcomings, she would still be employed by the Respondent." Def.'s Br. in Supp. of its Mot. for Summ. J., Ex. 19, p. 7. Plaintiff did not exercise her right to file a lawsuit seeking de novo review of the CCRD's determination within the period permitted for filing such a lawsuit.

Based on the July 7, 2004 e-mail, Defendant contends that it made the decision to terminate Plaintiff's employment on July 9, 2004. This is supported generally by the deposition testimony of Ms. Caprio, Ms. Scott and Ms. Ray and also by the Declarations of Ms. Ray and Ms. Scott attached as Exhibits 28 and 29 to Defendant's Brief in Support of its Motion for Summary Judgment. While Plaintiff does not dispute that Ms. Caprio was involved in this decision, she disputes the level of involvement of Ms. Ray, Ms. Caprio's boss, and Ms. Scott from Human Resources. While Ms. Scott requested that Plaintiff have a conversation with Ms. Ray and for them to let her know what action they thought was appropriate, she testified that she felt Plaintiff's actions warranted termination. Ms. Ray testified that she remembered telling Ms. Caprio that because of that e-mail Plaintiff needed to be terminated.

Plaintiff was informed on Monday, July 12, 2004, that her employment was terminated. The Separation Request for Plaintiff was also signed on July 12, 2004 by Ms. Scott and Ms. Caprio.

At her deposition, Plaintiff was asked that she confirm "the things that occurred and the things that you're aware of that are - that occurred prior to June 22, 2004, that caused you to believe the termination of your employment was influenced by your fighting to make sure your people were paid what they had coming to them in commissions." Plaintiff testified to the following: (a) that Ms. Caprio was not supportive of Plaintiff in January with respect to a request made by Plaintiff concerning credit she wanted to receive for certain categories of sales; (b) that Ms. Caprio did not provide appropriate follow up in 2004 when Plaintiff filed appeals on behalf of her sales representatives; (c) that Ms. Caprio did not directly inform Plaintiff that she could participate in Compensation Appeal hearings; (d) that during a telephonic team meeting, Plaintiff raised an issue about information she had observed on the Colorado Department of Labor website and Ms. Caprio was irate and dismissive in responding; and (e) that when Plaintiff asked about quota or compensation, Ms. Caprio became irate with her. Plaintiff contends that she was not asked, and did not testify to, the factual basis for her claims for relief. The above facts thus may or may not be relevant to Plaintiff's first claim. Plaintiff also submits a number of additional facts that she claims are relevant to her efforts to obtain compensation for her team.

Plaintiff's admits, however, as to her public policy claims that she is claiming she was terminated based, at least in part, on two additional factors that occurred after June

22, 2004: (1) that she was given the July 7, 2004 PIP; and (2) that her attorney sent a letter dated July 8, 2004 letter to the Colorado Department of Labor and Mr. Pember in Washington, who was a member of Defendant's Compensation Appeals Committee.

As to the July 8, 204 letter, Plaintiff's attorney Sean McGill wrote this letter to the Colorado Department of Labor and copied it to Mr. Pember. Mr. McGill testified that the letter was probably mailed by his office on July 8 or on July 9, 2004, but it was possible that it was not mailed until July 12, 2004 although this was highly unlikely. If it was mailed on July 8, 2008, it would have been mailed in the evening mail since it was last modified late in the day (at 4:41 p.m.). Mr. McGill later testified in an affidavit that he located that letter in the files and that it was copied onto yellow paper. It was his firm's practice to photocopy onto yellow paper a letter that was mailed out, and that it was the practice to mail a letter on the date it was finalized if the staff received it in time to make the evening mail.[4]

Mr. Pember has no memory of ever having received the McGill Letter, although the copy of the letter to him was not returned to Mr. McGill's office. Ms. Ray, Ms. Scott and Ms. Caprio have submitted affidavits stating that they had no knowledge of the existence of the McGill Letter when they made the decision to terminate Plaintiff's employment, and that they did not learn of the existence of the letter until after this

---

[4] Ms. Totten, a legal assistant in Mr. McGill's firm, testified that the firm's procedure was for all outgoing mail to go into a mailbox and for a runner to take mail in that box to the post office at about 4:55 p.m. The practice was for the legal assistant to attach a sticker to the envelope, identifying the date for which it was prepared, the date, and who was sending the letter. The sticker for the July 8, 2004 letter is dated July 8. If the sticker had been prepared after the runner left for the post office on July 8, 2004, Ms. Totten testified that the legal assistant would have put the date of July 9, 2004 on the sticker. Ms. Totten also testified that the billing records of the firm show expenses of $1.11 for mailing the letter and $0.90 for copies of the letter, and show a date of July 8, 2004 for both of those items.

lawsuit was filed.[5]  Ms. Juanita E. Wright, Compliance Officer for the Division of Labor, stated in an affidavit that the Division of Labor has no record of ever having received the McGill Letter and has no record of ever having received a complaint from Plaintiff.

III.    ANALYSIS

    A.    Summary Judgment Standard

    Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Id.* (quotation omitted).

---

    [5]  In response to a question whether anyone at AT&T Wireless ever discussed this letter with her, Plaintiff testified that Nancy Mayer, a friend of Plaintiff's who was also a Human Resource Manager for Defendant, told Plaintiff that she had seen a copy of the letter from Mr. McGill on either the 13th or 14th of July.  According to Plaintiff, Ms. Mayer told Plaintiff that she had received a copy of the letter from Plaintiff's attorney and that she forwarded it to legal.  Ms. Mayer, however, testified that the letter she received from Plaintiff's attorney was a different letter, *i.e.,* a July 14, 2004 letter from Mr. McGill that is addressed to Ms. Mayer.  Further, she testified that she had never seen the July 8, 2004 letter until it was shown to her at her deposition.

B.    Plaintiff's Public Policy Claims

According to the Colorado Supreme Court, "[t]he essence of the public-policy exception is that an employee will have a cognizable claim for wrongful discharge 'if the discharge of the employee contravenes a clear mandate of public policy.'" *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992) (quotation omitted).  The public-policy exception is grounded in the notion that an employer should be prohibited from discharging an employee with impunity for reasons that contravene widely accepted and substantial public policies.  *Crawford Rehabilitation Servs., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997).  "Although public-policy wrongful discharge is not subject to precise definition, it has been variously described as an action that involves a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer,. . . leads to an outrageous result clearly inconsistent with a stated public policy, . . . or 'strike[s] at the heart of a citizen's social rights, duties, and responsibilities'. . . ."  *Id.* (internal citations and quotation omitted).

An at-will employee establishes a *prima facie* case of wrongful discharge under the public policy exception if the employee presents evidence as to the following:

> that the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job related right or privilege, that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; and that the employee was terminated as the result of refusing to perform the act directed by the employer.

*Lorenz*, 823 P.2d at 109; *see also Weissman*, 938 P.2d at 553.  The employee must

also "present evidence showing that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker." *Lorenz*, 823 P.2d at 109.

### 1.    First Claim for Relief

Despite lengthy briefing of the alleged issues of material fact in this case, the basis of Plaintiff's first claim for relief is somewhat unclear. While Defendant refers to five (5) alleged factual bases for the claim, Plaintiff asserts that the evidence supporting this claim is not limited to such factors. It is undisputed, however, that the claim is primarily based on the fact that Plaintiff was discharged because she protested her employer's failure to pay her and the members of her team accurately for many months. *See* Pl.'s Amended Br. in Opp. to Def.'s Mot. for Summ. J at 30 and 16-17.

I first address whether Plaintiff's allegations give rise to a claim for wrongful discharge under the public-policy exception. Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment. *Weissman*, 938 P.2d at 553. Thus, "[a]lthough an employee terminated for exercising a job-related right may state a cognizable claim for wrongful discharge in violation of public policy under certain circumstances. . . [the] public policy [implicated] 'must concern behavior that truly impacts the public in order to justify interference into an employer's business decisions.'" *Id.* (quotation omitted); *see also Jaynes v. Centura Health Corp.*, 148 P.3d

241, 245 (Colo. Ct. App. 2006) (the plaintiff must show that the issue about which plaintiff complained articulated a public policy by creating "an important job-related right or privilege"); *Weissman*, 938 P.2d at 553 ("the employee must prove that 'the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's rights as a worker. . . .'") (quoting *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524 (1996)).

I find that Plaintiff's assertion that she was fired because she complained that she and her team members were not being paid properly implicates public policy. Accordingly, I find that this supports a public policy claim based on *Hoyt v. Target Stores, Div. of Dayton Hudson Corp.*, 981 P.2d 188 (Colo. Ct. App. 1998). In that case, the court found that the issue of a right of employees to be duly compensated by an employer under the Colorado Wage Claim Act, for time actually worked, was an issue of major public and economic importance in Colorado. *Id.* at 191-92. There, as here, the plaintiff was claiming that she was fired because she exercised her job-related right to be properly compensated.

However, I find that the vast majority of Plaintiff's other complaints which may form a part of the first claim do not implicate a clearly expressed public policy relating to the employee's rights as a worker or an important job-related right or privilege. In *Weissman*, a claim that the plaintiff "was terminated for exercising a right to call the division to complain that Crawford was attempting to eliminate her morning and evening rest breaks" did not state a claim since it did not implicate a "fundamental, substantial

public policy." *Id. Weissman* did not allege any public health, safety, or welfare concern, and the court discerned no clearly expressed public policy relating to an employee's basic rights or duties. The court noted that Weissman did not allege that she was employed in a position that could implicate public safety concerns if she were not permitted to have a certain number and frequency of breaks. *See also Jaynes*, 148 P.2d at 243-45 (allegation that nurse's termination was in retaliation for conduct required by ethical duties emanating from private, as compared to governmental source, was not embodiment of public policy sufficient to sustain a wrongful discharge claim).

Based on the foregoing, I find that Plaintiff's complaints related to the PIP that she was put on, the quotas assigned to her which she contends were incorrect, her complaints about not being involved in the appeals process, or the other myriad issues which Plaintiff raises in the fact section of her briefs, do not state a public policy claim.[6] Accordingly, I grant summary judgment in connection with that portion of Plaintiff's first claim.

The next issue I must address on the remaining public policy claim is whether Plaintiff has presented evidence that she was fired because she exercised her right to complain about such pay. I find that Plaintiff has not presented such evidence. Instead, the evidence is uncontroverted that Defendant, through Ms. Caprio, Ms. Ray and Ms. Scott, made the decision to fire Plaintiff because of Plaintiff's e-mail sent to Ms. Caprio in response to receiving the PIP.

---

[6] I address the letter from her attorney in connection with Plaintiff's second claim.

I note that Plaintiff spends a lot of time in her briefs arguing whether the decision to put her on a PIP was pretextual. In that regard, Plaintiff argues, among other things, that there is a genuine issue of material fact as to whether Defendant followed its personnel policies in placing her on a PIP without any prior verbal coaching or counseling. I find that is a red herring. There is no evidence that Plaintiff was fired because she was put on a PIP; thus, the issue of whether the PIP was pretextual is simply not relevant. Instead, the evidence is that Plaintiff was fired because of her e-mail response to the PIP which her supervisors deemed to be insubordinate. Plaintiff has not alleged any evidence of pretext in connection with the decision to fire her based on that e-mail. Accordingly, I find that summary judgment is appropriate on Plaintiff's first claim.

### 2. Second Claim for Relief

Plaintiff's second claim asserts that Defendant wrongfully terminated her employment "because she had exercised her right as an employee and as a citizen to have the Colorado Department of Labor investigate her allegations of improper pay and improper pay practices." (Comp. ¶ 17.) This claim relates to the letter from Plaintiff's attorney Sean McGill dated July 8, 2008 to the Colorado Department of Labor which was copied to Mr. Pember of Defendant's Washington office. Defendant contends that summary judgment is appropriate as to this letter because it is undisputed that Cingular (and Ms. Scott, Ray and Caprio) were not aware of the letter when they made the decision to terminate Plaintiff. Further, the Compliance Officer for the Colorado Division

of Labor confirmed that the Division has no record of ever receiving the letter. Mr. Pember also denied receiving the letter.

I agree with Defendant that in order to defeat summary judgment, Plaintiff must identify material, admissible evidence that supports the conclusion that Plaintiff's employer was aware of the McGill letter before the termination decision was made. *Ferris v. Local 26*, 867 P.2d 38, 44 (Colo. Ct. App. 1993); *see also Peterson v. Utah Dep't of Corrections*, 301 F.3d 1181, 1188-89 (10th Cir. 2002). Even if the letter at issue were mailed on July 8th (the earliest it could have been mailed would be sometime after 4:41 p.m. when it was last revised) or July 9th, and even if I assume that Mr. Pember is deemed to have received the letter, it could not have been received by Mr. Pember in Washington, D.C. prior to the July 9, 2008, decision to terminate Plaintiff. Although Plaintiff asserts she was not actually notified of the decision to terminate her until July 12, 2008, she has presented no evidence to counter the evidence from Ms. Caprio and the other Cingular employees that they made the decision to terminate her on July 9, 2008.

Further, I note that relevant case law indicates that it is not just any representative of the employer that must have notice of the letter. Instead, it is the employer's supervisors that mke the termination decision who must have such notice. *Peterson*, 301 F.3d at 1189; *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993); *see also Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1195 (10th Cir. 2007); *Lyons v. Red Roof Inns, Inc.*, 130 Fed. Appx. 957, 965 (10th Cir.), *cert. denied*, 546 U.S. 1066 (2005), *Kirk v. City of Tulsa, Oklahoma*, 72 Fed. Appx. 747, 752 (10th Cir. 2003). Even if I were to

assume that the letter was received or should have been received by Mr. Pember before the termination decision was made, there is no evidence that this letter or its contents were transmitted or made known to the individuals who made the decision to terminate Plaintiff, *i.e.*, Ms. Ray, Ms. Scott and/or Ms. Caprio. Accordingly, I find that summary judgment is also appropriate on this claim.

IV.     CONCLUSION

Based upon the foregoing, I find that summary judgment is appropriate as to both of Plaintiff's claims for relief. Accordingly, it is

ORDERED that Defendant's Motion for Summary Judgment is **GRANTED**. Judgment shall enter in favor of Defendant and against Plaintiff. It is

FURTHER ORDERED that the five (5) day jury trial set to commence Monday, November 17, 2008, and the Final Trial Preparation Conference set Tuesday, November 4, 2008, at 4:00 p.m. are **VACATED**.

Dated:  September 22, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge